RAGNER, Plaintiff-Respondent, v. ZIELKE, Mayor, City of La Crosse, and others, Defendants-Appellants.

Supreme Court

*No. 76–598. Argued September 5, 1978.—Decided January 9, 1979.*
(Also reported in 273 N.W.2d 304.)

For the appellants there was a brief by *William J. Sauer*, deputy city attorney of La Crosse, and oral argument by *Everett Hale*, deputy city attorney of La Crosse.

For the respondent there was a brief by *Richard V. Graylow* and *Lawton & Cates* of Madison, and oral argument by *Mr. Graylow*.

SHIRLEY S. ABRAHAMSON, J. On November 15, 1971, Ronald Ragner was hired by the La Crosse Fire Department as a firefighter funded under the federal Emergency Employment Act (E.E.A.). On December 31, 1973, Ragner's employment was terminated because E.E.A. funds were no longer available. Ragner asserts that the city's failure to rehire him to fill a vacancy in the fire department violated sec. 62.13(5m), Stats., relating to the dismissal of subordinates of the fire department. The trial court ordered Ragner reinstated to his former position with seniority and back pay. The defendants-appellants (hereinafter referred to as the city) appeal from that order. We vacate the trial court order.

## I.

In the fall of 1971 Ragner's application for employment with the City of La Crosse Fire Department was processed and a physical examination certified him as "fit" for such employment. Sec. 62.13(4), Stats., provides that the chief of the fire department "shall appoint subordinates subject to the approval" of the board of police and fire commissioners. On December 7, 1971, the chief wrote to the board reporting that on November 15, 1971, four men, one of whom was Ragner, "were assigned to the Fire Department under the Emergency Employment Act program. They were placed on a day shift and trained in the basic fundamentals of the department . . . . The two week training period being com-

pleted, they were assigned to regular shifts . . . . These men were hired without previous approval of the Police and Fire Commission due to the fact that immediate employment was a condition of the Emergency Employment Act. Your approval of their temporary appointment is requested." The record does not show that the board approved the appointment, but it does show that Ragner was on the job from November 15, 1971 through December 31, 1973. His duties in the fire department were identical to those of the regularly employed city firefighters. The only difference between Ragner and the other firefighters was in the source of their compensation: Ragner was compensated by the city from federal funds provided under the E.E.A. The regularly employed city firefighters were compensated by the city from city funds.

In a letter to Ragner dated December 18, 1973, Irvin R. C. Kahler, Chief of the La Crosse Fire Department, informed Ragner that his employment with the City of La Crosse would terminate on December 31, 1973. The letter stated that "the reason for this action is that funds are no longer available under the provisions of the Emergency Employment Act."

When the city dismissed Ragner, he was given no opportunity to return to work in the department. His name was not placed upon a list of persons eligible for reemployment in the fire department pursuant to sec. 62.13 (5m), Stats., which provides:

"(5m) DISMISSALS AND RE-EMPLOYMENT. (a) When it becomes necessary, because of need for economy, lack of work or funds, or for other just causes, to reduce the number of subordinates, the emergency, special, temporary, part-time, or provisional subordinates, if any, shall be dismissed first, and thereafter subordinates shall be dismissed in the order of the shortest length of service in the department, provided that, in cities where a record of service rating has been established prior to January

1, 1933, for the said subordinates, the emergency, special, temporary, part-time provisional subordinates, if any, shall be dismissed first, and thereafter subordinates shall be dismissed in the order of the least efficient as shown by the said service rating.

"(b) When it becomes necessary for such reasons to reduce the number of subordinates in the higher positions or offices, or to abolish any higher positions or offices in the department, the subordinate or subordinates affected thereby shall be placed in a position or office in the department less responsible according to his efficiency and length of service in the department.

"(c) The name of a subordinate dismissed for any cause set forth in this section shall be left on an eligible re-employment list for a period of two years after date of dismissal. If any vacancy occurs, or if the number of subordinates is increased, in the department, such vacancy or new positions shall be filled by persons on such list in the inverse order of the dismissal of such persons."

At issue is whether Ragner must be accorded the benefits of sec. 62.13(5m). The parties stipulated that the first city-budgeted vacancy for which Ragner might have been eligible occurred October 21, 1974.

## II.

The Emergency Employment Act of 1971, P.L. 92–54, 85 Stat. 146, 42 U.S.C. sec. 4871 *et seq.,* was enacted as a temporary measure during a high unemployment period to provide transitional public employment for the unemployed.

The purpose of the E.E.A. was stated by Congress in the following language:

". . . It is therefore the purpose of this Act to provide unemployed and underemployed persons with transitional employment in jobs providing needed public services during times of high unemployment and, wherever feasible, related training and manpower services to enable such

persons to move into employment or training not supported under this Act." (Sec. 2) [1]

The Secretary of Labor implemented the Act by entering into agreements with applicants (primarily units of state or local government), whereby the federal government appropriated funds to enable the government agency to hire the unemployed in public service jobs.

The E.E.A. mandates that the applications for a public service employment program include numerous provisions, several of which appear to be directed to assuring that wherever possible the local program would enable those employed with E.E.A. funds to obtain permanent employment.[2] To further this goal of the E.E.A., the

---

[1] Congress was attempting to avoid the creation of "dead end jobs in the public sector." Its goal was to provide employment in jobs in the public sector and to enable the individuals, wherever possible, to move into more permanent employment (not funded under the E.E.A.) in either the public or private sector. S. Rept. No. 92–48 Conf. Rept. No. 92–310, 92d Cong., 1st Sess. (1971), 1 U.S. Code, Cong. & Adm. News 1180, 1202. *See Mando v. Beame,* 398 F. Supp. 569, 575 (S.D.N.Y. 1975).

[2] "Sec. 7. (a) Financial assistance under this Act may be provided by the Secretary for any fiscal year only pursuant to an application which is submitted by an eligible applicant and which is approved by the Secretary in accordance with the provisions of this Act. Any such application shall set forth a public service employment program designed, in times of high unemployment, to provide transitional employment for unemployed and underemployed persons in jobs providing needed public services and, where appropriate, training and manpower services related to such employment which are otherwise unavailable, and to enable such persons to move into employment or training not supported under this Act.

"(b) Programs assisted under this Act shall, to the extent feasible, be designed with a view toward—

"(1) developing new careers, or

"(2) providing opportunities for career advancement, or

"(3) providing opportunities for continued training, including on-the-job training, or

regulations state that the local government shall use at least half the vacancies occurring in suitable occupations for the purpose of providing E.E.A. funded employees permanent employment.[3]

In 1971 La Crosse County was designated a recipient of financial assistance under the E.E.A., and by further agreement the City of La Crosse was made a sub-agent to whom E.E.A. funds were to be distributed. In its application for E.E.A. funding, the city agreed to conduct its E.E.A. program in accordance with the statutes and the regulations promulgated by the Secretary of Labor for E.E.A. programs.

On June 30, 1973, federal funding of new programs under the E.E.A. ceased. E.E.A. programs then in operation, including the program employing Ragner, were

---

"(4) providing transitional public service employment which will enable the individuals so employed to move into public or private employment or training not supported under this Act."

*See also* sec. 7(c)(3), (5), (6), (16) and sec. 12(a)(6) which states that the Secretary shall not provide financial assistance for any program unless the program will, to the maximum extent feasible, contribute to the occupational development or upward mobility of individual participants.

[3] "The following commitments by the Program Agent must be part of the grant application. Failure to comply with them may lead to the withholding or denial of grant funds:

". . .

"(d) Agreement by the Program Agent that it and the employing agencies responsible to it will have the goal of placing half of the participants in continuing positions with the Program Agent or employing agency financed from funds other than grant funds under the Act. Until this goal is reached the Program Agent and the employing agencies responsible to it shall utilize at least half the vacancies occurring in suitable occupations in their respective work forces not financed by funds pursuant to this Act for the purpose of providing participants permanent employment, except where this is prohibited by hiring practices required by law, regulation, or collective bargaining agreement and the Program Agent or employing agency has submitted a statement explaining the prohibition." 29 CFR sec. 55.6(d) (1972).

phased out using funds allocated under the Comprehensive Employment and Training Act of 1973. Pub. L. 93–203, sec. 3 (1973). On December 31, 1973, the employment of Ragner and the two other remaining E.E.A. firefighters in La Crosse was terminated.

### III.

The parties stipulated that Ragner's dismissal did not comply with sec. 62.13(5m), Stats. The city apparently contends that it need not comply with the requirements of sec. 62.13(5m) because Ragner is a firefighter funded by the E.E.A. and not by the city. Ragner argues that the very terms of sec. 62.13(5m) apply to him and that furthermore the E.E.A. mandates the application of sec. 62.13(5m) to his dismissal.

Sec. 62.13 (5m)(a), Stats., specifies the order in which subordinates in city fire or police departments are to be dismissed "[w]hen it becomes necessary, because of need for economy, lack of work or funds, or for other just causes, to reduce the number of subordinates" in a fire or police department. Any "emergency, special, temporary, part-time, or provisional subordinates" are to be dismissed first. No order is set forth in which subordinates in these categories are to be dismissed. Other subordinates are then to be dismissed in the order of the shortest length of service in the department.[4]

Sec. 62.13(5m)(c) provides that the names of fire department subordinates dismissed under subsection (a) shall be placed for two years upon an "eligible reemployment list." Vacancies or new positions are to be filled by persons on that list.

A dismissed subordinate has rights under subsections (a) and (c) only if his or her dismissal results "because

---

[4] Sec. 62.13(5m)(a), Stats., provides an alternative order of dismissal for "cities in which a record of service rating had been

of need for economy, lack of work or funds, or other just causes, to reduce the number of subordinates." The meaning of this quoted phrase can be discerned by looking at the events which underlay the enactment of sec. 62.13 (5m).[5] In 1929 a city council reduced the number of police detectives from four to three. This ordinance was implemented by the dismissal of one of the senior detectives then on the police force. In 1919, ten years earlier, an economy move had reduced the number of employees and several regular employees who had served the police department from one to twelve years were laid off though less senior employees were retained. The legislature did not intend sec. 62.13 (5m) to apply to a dismissal for "lack of funds" caused by the foreseeable cessation of limited federal funds distributed under a special employment program. Ragner was an employee temporarily hired for a transitional period with limited federal funds under a federal emergency employment act. He was dismissed when those federal funds expired. We do not believe that such a dismissal comes within the statutory concept of reducing the number of subordinates because of lack of funds. We therefore conclude that Ragner's dismissal does not entitle him to rights under sec. 62.13 (5m), Stats.

. Ragner contends that even if sec. 62.13 (5m) does not by its own terms apply to him, the E.E.A. requires that the city grant him sec. 62.13 (5m) rights.[6] We do not agree with this contention.

established prior to January 1, 1933." This alternative order is inapplicable to the city of La Crosse.

[5] Wis. Legislative Reference Bureau file on ch. 58, Laws of 1933. *See State ex rel. Miller v. Baxter,* 171 Wis. 193, 176 N.W. 770 (1920).

[6] Ragner and the city cite three cases raising the question of the applicability of state or municipal regulations to E.E.A. or C.E.T.A. employees. At issue in *Wolkin v. Civil Service Commission of the City of Tucson,* 21 Ariz. App. 341, 519 P.2d 194 (1974), was whether a city attorney who had qualified as a civil service employee but hired under the E.E.A. was entitled to rights granted

Included in the E.E.A. is an "equal-treatment provision" requiring that an E.E.A. funded. employee be given fringe benefits, working conditions, and promotional opportunities similar to those that other employees enjoy.

"Sec. 12(a). The Secretary [of Labor] shall not provide financial assistance for any program or activity under this Act unless he determines, in accordance with such regulations as he shall prescribe, that . . . .
"
". . .
"(4) All persons employed in public service jobs under this Act will be assured of workmen's compensation, health insurance, unemployment insurance, and other benefits at the same levels and to the same extent as other employees of the employer and to working condi-

employees under Civil Service Commission rules and regulations. The court held that civil service provisions of the Tucson Code by their own operation applied to the employees, and that the E.E.A. did not prevent such an application.

In *DeLarmi v. Borough of Fort Lee*, 132 N.J. Super. 501, 334 A.2d 349 (1975), two police officers funded under E.E.A. contended that a competitive civil service examination was an "artificial barrier to employment and occupational advancement" within the meaning of the E.E.A. and that as E.E.A. employees they were relieved from taking the examination as a condition of permanent employment. The court found that the examination was not an "artificial barrier" and that the E.E.A. employees were subject to the examination.

In *White v. City of Paterson*, 137 N.J. Super. 220, 348 A.2d 798 (1975), the right of the city of Paterson to hire firefighters who had not qualified for their jobs under the Civil Service Act and who were to be paid with CETA funds was challenged. The court, relying upon a New Jersey statute providing that only firefighters who were in the "paid service" of a municipality were under civil service, found that the CETA-funded firefighters were not in the paid service of Paterson and therefore not within the civil service rules.

None of these cases construes state or local law substantially similar to sec. 62.13(5m), Stats. Nor does any of them discuss the issue of whether sec. 12(a)(4) of the E.E.A. would require the application of an otherwise inapplicable state or local law to an E.E.A. participant.

tions and promotional opportunities neither more nor less favorable than other employees enjoy."

Labor Department Regulations under the E.E.A. have a similar purport:

"[P]articipants shall receive the protection of the same workmen's compensation, health insurance, unemployment insurance, and other benefits as other employees of the employer similarly employed, and shall enjoy working conditions and promotional opportunities neither more nor less favorable than such other employees enjoy." 29 CFS sec. 55.19(a) (1972).

The importance of this "equal-treatment provision" is evident from the legislative history of the E.E.A. The Senate Committee on Labor and Public Welfare, in its report on the Senate bill that later became the E.E.A., stated:

"The committee is clear in its intent that persons employed in public service jobs are to be treated no differently from other persons employed in similar public occupations by the same employer. Wages are to be paid at the prevailing rates of pay for similar public occupations by the same employer. (In no event may wages be paid at less than the minimum wage.) Employee benefits are to be assured at the same levels and to the same extent as other employees of the public service employer." S. Rep. No. 92-48, 92d Cong., 1st Sess. (1971), 1 U. S. Code Cong. and Admin. News, 1189.

The House Conference Committee on the Senate bill reported as follows:

"Both the Senate bill and House amendment provide that participants will have the same fringe benefits and working conditions as other employees of the employer. The Senate bill also stipulates that participants will enjoy promotional opportunities neither more nor less favorable than other employees enjoy. The House recedes." H. Rep. No. 92-310, 92d Cong., 1st Sess. (1971), 1 U. S. Code Cong. and Admin. News 1208.

We do not regard the rights granted under sec. 62.13 (5m) regarding dismissal and reemployment to be within the benefits prescribed in the E.E.A. "equal-treatment provision." Sec. 62.13 (5m) does not grant rights to workmen's compensation, health insurance, or unemployment insurance. The phrase "other benefits," as used in the E.E.A., is interpreted under the doctrine of *ejusdem generis* to be fringe benefits similar to the ones set forth in the statute.[7] Nor does sec. 62.13 (5m) grant rights to certain "working conditions" which in the usual meaning of the phrase refers to physical conditions of the place of employment and occupational health and safety. Sec. 29 CFR Sec. 55.19. Sec. 62.13 (5m) does provide rights relating to dismissal and re-employment, but dismissal and re-employment are not comprehended in the usual meaning of the phrase "promotional opportunities." The dictionary definition of promotion is the act or fact of being raised in position or rank. Had Congress intended to require equality not only of promotional opportunities but also of dismissal and re-employment rights, it could easily have stated this requirement.

It cannot plausibly be maintained that the E.E.A. by virtue of the equal-treatment provision or any other provision requires that the city place all former E.E.A. participants in continuing city-budgeted positions. The statute and the documents in the record before us make it clear that an important goal of the E.E.A. is that an employee funded under E.E.A., if qualified, be given an opportunity for a non-E.E.A. position if through normal attrition, retirement, death or increased budget such a position becomes open. However, Congress chose not to require that vacancies in city-budgeted position be filled by employees funded by E.E.A.

---

[7] *Schmidt v. United States,* 369 F. Supp. 64, 66–67 (E.D. Wis. 1974); *State v. Engler,* 80 Wis.2d 402, 408–409, 259 N.W.2d 97 (1977).

Instead, Congress sought to foster the city's continuing employment of E.E.A.-funded individuals by other means. The federal government chose to establish goals for the city's hiring the E.E.A. employees. The regulations provide that the local government unit have the goal of placing half of the E.E.A. employees in continuing non-E.E.A. positions and of using at least half of the vacancies in suitable occupations for the purpose of providing participants with permanent employment. 29 CFR Sec. 55.6(d). The Public Employment Program Handbook, reprinted in part as an exhibit, speaks in terms of the goal of placing half the E.E.A.-funded employees in continuing positions with the employing agency financed from funds other than E.E.A. funds.

The federal government intruded into the public service job market cautiously. Congress wished to achieve its goal of increased employment without creating additional problems in the public service job market and in the budgets of local governmental units. The E.E.A. was drawn so that it would not interfere with the job opportunities of those awaiting regular municipal employment or with the job security and promotions of those already employed. The E.E.A. was designed so that the programs funded did not impinge on the rights of civil service employees, on the merit system, or on collective bargaining agreements. *White v. City of Paterson,* 137 N.J. Super. 220, 225, 348 A.2d 798, 800–801 (1975).

Considering all these interests Congress was very careful not to require that a city continue the employment of each participant in an E.E.A. program.

Accordingly we hold that neither sec. 62.13(5m) nor the E.E.A. requires the city to grant Ragner the dismissal and reemployment rights he claims.

*By the Court.*—Order vacated; cause remanded to the trial court with directions to quash the writ.